## In re Howard D. MOORE, Respondent.

### A Member of the Bar of the District of Columbia Court of Appeals.

### No. 97–BG–612.

District of Columbia Court of Appeals.

Submitted Oct. 1, 1997.
Decided Nov. 6, 1997.

Before FARRELL, KING, and RUIZ, Associate Judges.

PER CURIAM:

The Board of Professional Responsibility ("the Board") has recommended that Howard D. Moore be disbarred. Bar Counsel has informed the court that it takes no exception to the Board's report and recommendation;

respondent has filed neither an exception nor a brief. We adopt the Board's recommendation.

Charges against respondent stem from his misappropriation of funds entrusted to him by a client, his repeated invasion of his client escrow account to pay general business and other expenses, and his failure to cooperate with the subsequent investigation by Bar Counsel. Moore was charged with violations of Rules 1.15, 5.3, 8.4(b), 8.4(c), 8.4(d) of the District of Columbia Rules of Professional Conduct, D.C. Bar R.App. A, as well as Rule XI § 2(b)(3) of the District of Columbia Bar Rules.

After an evidentiary hearing, a hearing committee found that the evidence was sufficient to sustain all of the charges except for the one filed pursuant to Rule 8.4(b). Both the hearing committee and the Board have recommended dismissal of that charge.

For the reasons stated in the report and recommendation of the Board dated April 22, 1997 (a copy of which is attached as an appendix to this opinion), we conclude that respondent violated D.C. Rules of Professional Conduct 1.15, 5.3, 8.4(c), and 8.4(d) and D.C. Bar R. XI § 2(b)(3), and that the misappropriation was not the result of mere negligence. We have held that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc). Accordingly, it is hereby

ORDERED that respondent, Howard D. Moore, shall be disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion. We call respondent's attention to D.C. Bar R. XI § 14(g), requiring the filing of an affidavit containing certain information, and to D.C. Bar R. XI § 16(c), setting forth the consequences of a failure to file the affidavit within the time prescribed by section 14(g).

DISTRICT OF COLUMBIA
COURT OF APPEALS
BOARD ON PROFESSIONAL
RESPONSIBILITY

In the Matter of:
HOWARD D. MOORE,
Respondent.

Bar Docket No. 419-95.

*REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

Respondent was charged with a number of violations of the Rules of Professional Conduct, all arising from his handling of funds he received on behalf of a client in settlement of a personal injury action. Bar Counsel charged that Respondent was guilty of commingling and misappropriation, in violation of Rule 1.15, failure to supervise staff, in violation of Rule 5.3, illegal conduct that reflects adversely on a lawyer's honesty or fitness, in violation of Rule 8.4(b), fraudulent conduct, in violation of Rule 8.4(c), conduct seriously interfering with the administration of justice, in violation of rule 8.4(d), and failure to respond to a Board order, in violation of D.C.App. R. XI, § 2(b)(3). Because the Hearing Committee found, by clear and convincing evidence, that Respondent was guilty of misappropriation and that the misappropriation was not the result of mere negligence, it recommended that Respondent be disbarred. Neither Respondent nor Bar Counsel has excepted to the Hearing Committee's report. We agree with the reasoning and the recommendation of the Hearing Committee.[1]

The facts that establish commingling and misappropriation were drawn by the Hearing Committee from numerous documents demonstrating the amount of money in Respondent's trust fund at different times relevant to this inquiry and demonstrating the amounts owed to third parties. The facts are set out in detail in the Hearing Committee report. Briefly, the facts are as follows:

Respondent was retained in May, 1992, to represent D.C. Police Officer Carmichael Humble in connection with a personal injury claim. In that same month, Respondent executed an assignment and authorization form in favor of Dr. Franklin Garmon, a physician who had agreed to provide medical treatment to Officer Carmichael [Humble]. Officer Carmichael [Humble] obtained treatment from Dr. Garmon from May, 1992 through May, 1994.

By June, 1994, Dr. Garmon had provided Respondent with invoices for medical services provided to Officer Humble in the amount of $16,043.85. On or about November 14, 1994, Respondent received an insurance carrier's check for $80,000 in full settlement of Officer Humble's personal injury claims. On November 30, 1994, Officer Humble executed the carrier's form release and endorsed the settlement check for deposit. On the same day, Respondent deposited the settlement check into his "trust account".

Immediately prior to the deposit of the $80,000 settlement check, the balance in the trust account was $14,813.21. Included in the account were funds belonging to Respondent's mother-in-law, Mrs. Dorothy Thorne. Between November 30, 1994 and April 24, 1995, a number of checks, totaling $4,976.98, were written on the trust account to pay for Mrs. Thorne's care and for expenses related to her death. Tr. 96–98, 118–121,123–124; Hearing Committee Appendix.

During the period of time relevant to this inquiry, Respondent's wife managed the law office, including all bookkeeping functions for trust and commercial checking accounts. Mrs. Moore had signature authority over those accounts and it is her name that appears on many of the checks drawn on the trust account. Respondent acknowledged, however, that he supervised his wife's management of the trust account and authorized

---

1. With the exception of the charge that Respondent was guilty of illegal conduct, as to which the Committee made no finding, the Hearing Committee also found that Bar Counsel had proven the other violations charged. We agree with the Hearing Committee on these conclusions as well, although we remind the Committee that it should make findings as to all of the charges brought by Bar Counsel, unless Bar Counsel decides not to pursue them. Based on our review of the record, we do not find clear and convincing evidence that Respondent is guilty of illegal conduct.

all banking transactions conducted by Mrs. Moore. Tr. 85.

Respondent did not provide a written settlement sheet to Officer Humble, detailing proposed disbursements, until February 14, 1995. By that time, the funds in the trust account had dropped below $80,000. On January 19, 1995, Respondent caused a check to be written on the trust account, payable to himself, in the amount of $2,000.00. A notation on the check indicated "transfer". As a result of that check, the trust account balance dropped to $78,892.40.[2] Again, on January 27, 1995, Respondent caused a check written on the trust account to be presented for payment. Again, the check was payable to himself, in the amount of $1,000.00, and also bore the notation "transfer."[3] As a result of that check, the balance in the trust account dropped to $77,892.40.

By the time Respondent provided Officer Humble with a settlement sheet, the balance in the trust account was $73, 125.20. According to the settlement sheet, Officer Humble was due $20,969. The settlement sheet also indicated that Respondent was due $26,-600.00, but that he was reducing his fees by $3,500.00. BX 9. The District of Columbia government had agreed to reduce its lien for leave-related benefits by the same amount. According to the settlement sheet, therefore, Respondent was owed $23,100 out of the settlement proceeds, $23,102.85 were needed to pay outstanding medical expenses, including Dr. Garmon's bill, which, according to the settlement sheet, amounted to $20,337.85,[4] and $12,827.84 were needed to pay the D.C. government for non-medical expenses.

Officer Humble approved the settlement figures. Respondent gave Officer Humble a check drawn on the trust account for $20,969. Shortly after that, Officer Humble testified, Respondent advised him that all of the other creditors had been paid. Tr. 22, 45.

Respondent did not write a check to himself for the amount he was due from the settlement proceeds. Instead, Respondent simply wrote checks on the trust account. Some of the checks were made out to Respondent and apparently were deposited into Respondent's operating account. Tr. 133–34. Between November 30, 1994 and October 31, 1995, the total amount of the checks made out to Respondent was $46,220.00. Other checks were made out to various service providers, including health services, the funeral home, the Washington Post, and the Clerk of the D.C. Superior Court.[5]

On February 16, 1995, after removing the $20,969.31 delivered to the client, the balance in the trust account was $52,155.89. The amount needed to pay the medical providers and the D.C. government, according to the settlement sheet, was $35,930.69.

As of May 19, 1995, after numerous checks were written to Respondent and to other persons and entities, none of which had anything to do with Officer Humble, the balance in the trust account fell to $33,609.96. No

2. Respondent did not produce a ledger or other record of the activity in his trust and commercial accounts. He offered no explanation for his handling of the funds that should have been held in trust for his client and his client's creditors other than that he lost track of how much money was in the accounts. As a result, the Hearing Committee had to reconstruct what happened to the money by reviewing bank statements and canceled checks from Respondent's trust and commercial checking accounts. Attached as an appendix to the Hearing Committee report is a chart showing all of the activity in the trust account between November 23, 1994 and October 31, 1995, with the balance in the account after each transaction. [The appendix is not attached to this opinion.] That chart makes it unmistakably clear that Respondent was using the trust account as an operating account, drawing funds out of the trust account as needed to pay bills or to transfer money to Respondent's other commercial account.

3. It appears that the checks written to Respondent from the trust account were deposited into his operating account and used to pay personal and/or business expenses. See BX 20, 36; Tr. 133–34.

4. The settlement sheet overstated the amount due to Dr. Garmon by $4,294.00, apparently because of Respondent's confusion over Dr. Garmon's submission of two separate invoices. If that amount was not needed to pay medical providers, however, it should have been delivered to the client. In either case, it was not money Respondent was entitled to spend. As did the Hearing Committee, we have included the $4,294.00 as funds that were needed for "other claims" against the settlement.

5. Respondent acknowledged that the checks to the Superior Court were filing fees for clients who had no funds deposited in the trust account. Tr. 121–23.

other persons with claims against the settlement had been paid as of that date. At no time between that date and the date of the hearing, May 24, 1996, was the trust account balance sufficient to cover the remaining claims against the settlement proceeds.

On August 25, 1995, a check was drawn on the trust account, payable to the D.C. Treasurer, in the amount of $12,827.84. The check bore the notation "fbo Humble" and was in apparent satisfaction of the claims of the D.C. government against the settlement proceeds. After payment of that check, the balance in the trust account was $12,363.15, insufficient to pay Dr. Garmon's outstanding medical bills. As of the date of the hearing, Dr. Garmon had not been paid.

*Respondent's Conduct during Bar Counsel's Investigation*

On August 10, 1995, Dr. Garmon complained to Bar Counsel that Respondent had failed to notify him of the settlement and had failed to pay him out of the settlement proceeds. BX 46. Bar Counsel advised Respondent of the complaint and requested his response. Respondent did not reply. After repeated letters, personally served on Respondent, Bar Counsel sought and received an order from this Board directing Respondent to provide Bar Counsel with substantive responses to Bar Counsel's inquiries. BX 48–49. Respondent failed to comply with the Board's order.

*Respondent's Explanation for his Conduct*

Respondent did not file an answer to Bar Counsel's petition. He did appear at the hearing and was ordered by the Hearing Committee to respond to an outstanding subpoena and to answer the Complaint. Respondent submitted a letter, BX 60, that the Hearing Committee found did not comply squarely with the terms of its order. HC Rep. at 13. Respondent offered no other documents or written submissions. He was called as a witness by Bar Counsel, but declined to provide additional testimony in his own defense.

As the Hearing Committee noted, Respondent admitted virtually all of the facts supporting the violations, but offered no coherent explanation for his conduct. HC Rep. at 6. In the letter to the Committee filed just prior to the hearing, Respondent mentioned ongoing negotiations regarding reductions in the third party claims and his expectation of a wire transfer into the account. Under the caption "Confusion, Error and Neglect", Respondent wrote that "[i]t was my intention at all relevant times to maintain the appropriate balance of funds in my trust account." BX 60 at 4. At the hearing, Respondent testified that his mishandling of the funds in the trust account was attributable to "confusion." When asked directly why, even as of the date of the hearing, Dr. Garmon had not been paid, Respondent testified that:

Well, I should have paid that bill—I wish I had paid that bill when I first got started with this.

Basically, I'm liable for these funds and I intend to pay it within a few days. I can just tell you that there was some confusion in my accounts, which at this point I still do not know how everything that happened here happened. But there was nothing intentional on my part to deprive this man of his income.

I think I have made some mistakes here. I think I was negligent about some things I should have paid attention to that I didn't. I don't think I accounted for the funds that were in my account properly. But basically I had—all of these time periods we had the funds to pay him.

Tr. 130–131.[6]

Respondent testified vaguely to several sources of "confusion", including his expectation of a wire transfer in August, 1995, that never came, his mother-in-law's illness and death, to a period in which he was ill himself and to an office arrangement that made it difficult for him to get his bank statements. Tr. 95–96, 104. He insisted that although he

---

6. The records of Respondent's trust and operating accounts established that, at least during the period between May 19, 1995 and October 31, 1995, Respondent did not have the funds in either of these accounts to pay the outstanding claims against the settlement proceeds. BX 24–29, 40–46; Tr. 134–137. The Hearing Committee also found that the documentary record demonstrated that Respondent was heavily burdened with consumer debt, was making minimum payments on several cards and was paying some accounts through collection agencies. Hearing Committee Report at 10 n. 6.

drafted checks on the trust account without keeping a ledger reflecting the funds in the account and without reviewing the bank statements, "if I had a check issued it was because I at least believed there was proper funds in the account." Tr. 105. In urging the Committee against a sanction of disbarment, Respondent admitted making mistakes, but "would not categorize what I did as willful or reckless, ... I think that I was simply—not simply but in many instances in this regard, I was careless, and I neglected to take care of matters that I should have taken care of." Tr. 160. Respondent admitted that, at least by August or September, 1995, he was aware that the trust account contained insufficient funds to pay Dr. Garmon. Tr. 139–40. He had no real explanation for his failure to restore the money to the trust account, other than that "there were just a lot of things that I intended to do that I didn't do." Tr. 139–141.

*Violations*

### I. *Rule 1.15*

### A. *Misappropriation of Trust Funds*

The Hearing Committee found that Respondent was guilty of several acts constituting misappropriation of trust funds. We agree.

Misappropriation is "any unauthorized use by an attorney of ... funds entrusted to him or her, whether or not temporary or for personal gain or benefit." *In re Choroszej*, 624 A.2d 434, 436 (D.C.1992). Violation of the rule is complete "when the balance in [the trust] account falls below the amount due the client." *In re Micheel*, 610 A.2d 231, 233 (D.C.1992); *accord, In re Pels*, 653 A.2d 388, 394 (D.C.1995).

An act of misappropriation was complete on January 19, 1995, when the trust account balance fell to $78,892.40. At that time, Respondent was not entitled to draw fees upon Officer Humble's settlement proceeds, because he had not yet provided his client with a list of proposed disbursements and received his client's approval.[7]

The offense of misappropriation is a *per se* offense requiring no proof that Respondent intended to use his client's funds for unauthorized purposes. *In re Choroszej*, 624 A.2d at 436 (D.C.1992); *In re Evans*, 578 A.2d 1141, 1142 (D.C.1990). Respondent's mental state is relevant to the appropriate sanction for his misconduct. *In re Addams*, 579 A.2d 190, 191 (D.C.1990) (en banc) ("in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence"). *Accord In re Pierson*, 690 A.2d 941, 948 (D.C. 1997); *In re Clarke*, 684 A.2d 1276, 1280 (D.C.1996); *In re Morrell*, 684 A.2d 361, 373 (D.C.1996); *In re Pels*, 653 A.2d at 389; *In re Micheel*, 610 A.2d at 237 (D.C.1992).

Bar Counsel urged that the evidence in this case establishes as least reckless misappropriation. The Committee found that "Respondent acted with knowledge that this invasion of trust proceeds was wrongful. We can draw no other conclusion from the delay in accounting for receipt of funds, the failure to cooperate with Bar Counsel's investigation, and Respondent's failure to produce any records to support his use of the trust proceeds." HC Rep. at 8. Because it is clear that Respondent's conduct was at least reckless, we find it unnecessary to decide whether the evidence also establishes that Respondent had actual knowledge, as of January, 1995, that the trust account had insufficient funds to cover the amount that he was obligated to hold in trust for Officer Humble. There is no doubt that the misappropriation is attributable to more than "mere negligence."

As of May 19, 1995, when the balance in the trust account fell below the sum that should have been held in trust to pay the client's creditors, Respondent was guilty of an additional act of misappropriation. As the Committee found, that misappropriation was ongoing at least through the date of the hearing, May 24, 1996. Again, Bar Counsel urged a finding of at least reckless misappropriation and the Committee found that "Respondent acted with knowledge that his use of the trust funds was wrongful. No other

---

7. In the event of a fee contest, Respondent would have been obligated to hold the disputed fee in trust. Rule 1.15(c).

conclusion can follow from Respondent's repeated use of Trust proceeds to pay his personal creditors rather than applying trust proceeds as entrusted." HC Rep. at 9. Again, we find it unnecessary to determine whether Respondent's misconduct was attributable to gross recklessness or to actual knowledge that the balance in the trust account was insufficient to cover the outstanding claims against the settlement proceeds. Respondent admitted that by August or September 1995, he was aware that there were insufficient funds in the trust account to pay Dr. Garmon. Tr. 139–40. He did not restore the funds to his trust account then and had not done so by the time of the hearing. Tr. 140–42. Prior to August, 1995, Respondent appears to have been operating without any sense of obligation to maintain records or to keep his own funds and debts separate from those of his clients. We agree with Bar Counsel and the Hearing Committee that the facts of this case are so egregious that the misappropriation cannot have been the result of mere negligence.

The Committee noted that Respondent, by his own admission engaged in two other acts of misappropriation of trust account funds. The two checks written to the D.C. Superior Court were used to cover Superior Court filing fees for clients who had no funds in the trust account. Tr. 121–123. Respondent testified that the use of trust account funds to pay those filing fees was inadvertent. *Id.* The Committee found that Respondent was grossly negligent in permitting those unauthorized uses of other people's entrusted money. HC Rep. at 9.

### B. *Commingling*

Commingling occurs when an attorney fails to hold entrusted funds in a special account, separate from his own funds. *In re Hessler,* 549 A.2d 700 (D.C.1988). As of February 14, 1995, Respondent was entitled to $21,500 as a fee for his representation of Officer Humble. By leaving the money in the trust account and using the trust account as if it were his personal checking account, Respondent was guilty of commingling.

### C. *Failure Promptly to Deliver to Client and Third Parties Funds They Were Entitled to Receive*

Rule 1.15(b) provides that:

Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property, subject to Rule 1.6.

There is no doubt that Respondent violated this rule. In May, 1992, Respondent executed an assignment and authorization to pay Dr. Garmon for the medical treatment provided Officer Humble from the settlement proceeds. In November, 1994, Respondent received $80,000 in settlement funds for Officer Humble's case. In February, 1995, Officer Humble authorized the disbursal of the settlement funds in accordance with the settlement sheet provided by Respondent. That settlement sheet indicated that Dr. Garmon was entitled to receive $20,337.85. Respondent negotiated a reduction of the bill to $16,837.85, to which Dr. Garmon agreed. Tr. 57; BX 11. Respondent testified that he believed that someone on his staff negotiated a further reduction, to $12,500. Tr. 94. As of the date of the hearing, Dr. Garmon had received no payment for his treatment of Officer Humble. Tr. 94, 143.

### II. *Rule 5.3: Failure to Supervise Nonlawyer Assistant*

Rule 5.3 provides in relevant part:

(b) A lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) A lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(2) The lawyer has direct supervisory authority over that person, or is a part-

ner in the law firm in which the person is employed, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Janice Moore, Respondent's wife and office manager was an authorized signatory on the trust and operating accounts. Tr. 82; BX 16. She drafted a number of the checks drawn on the trust account that are the bases for the misappropriation violations in this case. At the hearing, Respondent acknowledged that he authorized all banking transactions conducted by Mrs. Moore. Tr. 85. He is therefore responsible for the actions of Mrs. Moore that resulted in the commingling of his funds with client and third-party funds in his operating account, the misappropriation of those funds by withdrawals from the operating account to pay his business and personal expenses and the failure to pay Dr. Garmon and Officer Humble's other third-party medical care providers promptly.

### III. Rule 8.4(b) Criminal Conduct

The Hearing Committee made no findings regarding Bar Counsel's charge that Respondent's conduct constituted criminal conduct within the meaning of Rule 8.4(b) and recommended that the charge be dismissed. HC Rep. at 13. The Hearing Committee apparently was of the view that, in light of the other violations it found, it was unnecessary to make a finding on this charge. We have emphasized several times recently that it is incumbent on the Hearing Committee to make findings regarding all of the charges brought by Bar Counsel, even if in the Committee's view, the charge is surplusage. *See, e.g., In re Bernstein,* D.N. 292–94 (BPR Oct. 2, 1996). If the charge is based on the same conduct on which other charges are based, that fact can be taken into consideration in determining the appropriate sanction.

Respondent may be guilty of the offense of committing a criminal act that reflects adversely on the honesty, trustworthiness or fitness of a lawyer even if he has not been prosecuted for his crime. *In re Gil,* 656 A.2d 303 (D.C.1995). Bar Counsel has charged

that Respondent's unauthorized use of funds entrusted by his client to pay his client's medical bills amounts to theft. The offense of theft, however, requires that the person wrongfully use the property of another "*with intent* ... [t]o deprive the other of a right to the property or a benefit of the property; or ... [t]o appropriate the property to his or her own use or to the use of a third person" under D.C.Code § 22–3811(b)(1982). While Respondent's conduct undoubtedly was grossly reckless, perhaps, as the Hearing Committee concluded, rising to the level of actual knowledge that the funds were being used improperly, we do not find on this record clear and convincing evidence that Respondent *intended* to deprive either his client or third party creditors of their property or to appropriate their property to his own use.[8]

### IV. Rule 8.4(c): Conduct involving Dishonesty, Fraud, Deceit and/or Misrepresentation

Under Rule 8.4(c), the term "dishonesty" includes "conduct evincing 'a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness.'" *In re Shorter,* 570 A.2d 760, 767–68 (D.C.1990). Conduct that "may not be legally characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty." *Id.*

Respondent's statement to his client that all medical providers had been paid was a knowing misrepresentation. We agree with Bar Counsel and the Hearing Committee that Respondent violated this rule.

### V. Rule 8.4(d) and Rule XI, § 2(b)(3)

Respondent's failure to cooperate with Bar Counsel's investigation, despite personal service of letters, a motion to compel and an order from this Board directing him to respond to Bar Counsel's request for information is conduct that seriously interferes with the administration of justice, in violation of Rule 8.4(d) and D.C.App. R. XI, § 2(b)(3).

### Sanction

There can be no appropriate sanction for Respondent's numerous acts of misappropriation, commingling and other serious disci-

---

8. We interpret the Committee's failure to make a finding on this charge and its recommendation that it be dismissed as at least an indication that

the Committee was not convinced that the conduct here rose to the level of a criminal offense.

plinary violations other than disbarment. *In re Addams,* 579 A.2d at 191; *In re Gilchrist,* 488 A.2d 1354, 1358 (D.C.1985); *accord In re Morrell,* 684 A.2d at 372.

BOARD ON PROFESSIONAL RESPONSIBILITY

By:‗‗‗‗‗‗‗‗‗‗‗
       Elizabeth G. Taylor

Dated: April ‗‗‗, 1997

All members concur in this Report and Recommendation except Ms. Ossolinski, who is recused, and Ms. Brannan and Mr. Howard, who did not participate.